UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BENJAMIN P. FOREMAN,

      Plaintiff,               Case No. 2:22-cv-10401
                                    District Judge Laurie J. Michelson
v.                              Magistrate Judge Kimberly G. Altman

UNITED STATES OF AMERICA,
JONATHAN HEMINGWAY,
NP WEAVER, and OFFICER
PATTON,

      Defendants.

_____/

## **REPORT AND RECOMMENDATION ON MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 81, 83) AND PLAINTIFF'S MISCELLANEOUS MOTIONS (ECF Nos. 95, 101, 105)[1] AND RECOMMENDING *SUA SPONTE* DISMISSAL OF PATTON**

I.     Introduction

This is a civil rights case. Plaintiff Benjamin P. Foreman (Foreman),

proceeding *pro se*, filed a complaint naming the United States of America (the

Government), Warden Jonathan Hemingway (Hemingway), NP (Nurse

---

[1] Upon review of the parties' papers, the undersigned deems these matters
appropriate for decision without oral argument. *See* Fed. R. Civ. P. 78(b); E.D.
Mich. LR 7.1(f)(2).

Practitioner) Sarah Weaver (Weaver), and Officer Patton (Patton).[2]  He asserts

claims against the individual defendants under *Bivens v. Six Unknown Named*

*Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) and against the

Government under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680

(FTCA), alleging that defendants violated his rights while he was incarcerated at

the Federal Correctional Institution in Milan, Michigan (FCI Milan).  *See* ECF No.

1.  Foreman was released from FCI Milan on August 10, 2020.  *Id.*[3]

Under 28 U.S.C. § 636(b)(1), all pretrial matters have been referred to the

undersigned.  (ECF No. 10).

Before the Court are the Government's motion for summary judgment, (ECF

No. 81), and Hemingway's motion for summary judgment, (ECF No. 83).  Both

are fully briefed.  (ECF Nos. 89, 90, 91, 92).  Also pending are Foreman's motion

for leave to file an amended declaration, (ECF No. 95), his motion to amend the

complaint, (ECF No. 101), and his motion to add two federal defendants to the

complaint, (ECF No. 105).

---

[2] Counsel has appeared on behalf of the Government, Hemingway, and Weaver.
Patton, however, does not appear to have been properly served, (ECF No. 28), and
counsel for the Government has filed a statement indicating that FCI Milan has no
record of an Officer Patton at its facility (ECF No. 17).

[3] The undersigned verified this information by searching Foreman's name on the
Federal Bureau of Prisons prisoner locator website:
https://www.bop.gov/mobile/find_inmate/byname.jsp#inmate_results (last visited
July 11, 2024).

For the reasons that follow, the undersigned RECOMMENDS that the Government's motion for summary judgment be GRANTED; Hemingway's motion for summary judgment be GRANTED; Foreman's motion for leave to file an amended declaration be GRANTED; and Foreman's motions to amend the complaint and add defendants to the complaint be DENIED.  Further, the undersigned RECOMMENDS that Patton be dismissed *sua sponte* for Foreman's failure to serve him within the time limits set forth in Federal Rule of Civil Procedure 4(m).  If these recommendations are adopted, the case will be dismissed in its entirety.

## II.     Background

### A.     Allegations

The following facts are gleaned from the complaint, which Foreman filed on February 17, 2022.

Foreman was housed at FCI Milan during all relevant times, other than his transfer to St. Joseph Hospital from April 10, 2020 to May 1, 2020.  (ECF No. 1, PageID.8).  Foreman states that on April 6, 2020, he was unnecessarily transferred to a special housing unit after a temperature check revealed that his temperature was not above 100 degrees.  (*Id*.).  The next day, his temperature rose above 100 degrees, and he was transferred from the special housing unit to a COVID-19 isolation unit.  (*Id*., PageID.8-9).

On April 9, 2020, Foreman began suffering from dehydration after working out that day, and Weaver gave him intravenous fluids. (*Id*., PageID.9). Weaver left Patton in charge of Foreman upon leaving, but that night Patton ignored all of Foreman's requests for medical care or treatment. (*Id*.). Patton denied Weaver informing him to keep an eye on Foreman or apprising him of Foreman's condition. (*Id*.). The next morning, Weaver found Foreman unconscious in his cell. (*Id*.). Weaver failed to provide immediate medical treatment, but Foreman was eventually sent to the hospital later that day, where he was diagnosed with COVID-19 and placed on a ventilator for 19 days. (*Id*., PageID.9-10).

While on the ventilator, Foreman lost 52 pounds and was pronounced dead twice. (*Id*., PageID.10). Despite the severity of the illness, Foreman eventually recovered. (*Id*., PageID.10).

On May 1, 2020, Foreman's doctor recommended 30 days of rehabilitative therapy. (*Id*.). Foreman began therapy that day, but Hemingway did not allow Foreman to continue therapy and instead ordered him to be returned to custody, despite Foreman barely being able to walk. (*Id*.). When Foreman retuned to FCI Milan, he was placed in the COVID-19 isolation unit "in a dirty one-man cell where he was helpless [and] locked in the cell for 23 hours and 40 minutes a day." (*Id*.).

Foreman says that Hemingway recklessly caused him to contract COVID-19 by failing to both provide face masks for inmates in special housing units and conduct intake examinations for infectious diseases among incoming inmates. (*Id*., PageID.14). Foreman also asserts that Hemingway acted deliberately indifferent to his medical needs by denying him rehabilitative therapy and returning him to his cell in poor health. (*Id*., PageID.14-15). Foreman characterizes Hemingway's actions as Eighth Amendment violations constituting cruel and unusual punishment as well as Fifth Amendment violations of substantive due process. (*Id*., PageID.16-18).

Relating to the allegations above, Foreman asserts claims against the Government under the FTCA for medical malpractice and negligence. (*Id*., PageID.18-24).

## B.   Evidence

The Government and Hemingway rely on the exhibits to the Government's motion for their statements of facts.

Relying on the Department of Justice's Pandemic Response Report, Remote Inspection of Federal Correctional Institution Milan, the Government's brief summarizes FCI Milan's pandemic response as follows:

> FCI Milan took various steps to attempt to contain Covid-19 [in March and April, 2020]. For example, in early March, Milan began screening all new inmates before allowing them to enter the prison. Beginning March 8, Milan established 22 medical isolation and 22 quarantine beds

5

in the Special Housing Unit (SHU).  Beginning March 19, Milan began quarantining new inmates in the SHU for 14 days.  Beginning April 1, Milan confined inmates to their cells 23 hours a day.  On April 3, Milan added 48 medical isolation beds on E-block and more quarantine beds to the SHU.

Despite these steps, the largest influx of staff and inmate positive test results occurred during the first two weeks of April.  Social distancing was particularly difficult because roughly half of the inmate population was housed in open-bay units, where up to 74 inmates live together in open-air, dormitory-style bunks.  By April 3, 2020, three inmates and one staffer had tested positive for Covid-19.  By April 6, six more inmates had tested positive, and two more staff had left work with symptoms.  By April 8, eight more inmates had tested positive, and nine more staff members had left work with symptoms.

(ECF No. 81, PageID.1161-1162 (internal quotation marks and citations omitted)).

Forman testified at his deposition that he was housed in the "H-Unit" of FCI Milan in April 2020, which was one of the open-bay housing areas described in the above report.  (*Id.*, PageID.1163 (citing ECF No. 81-3)).  As of May 19, 2020, H-Unit had the highest number of total inmates that tested positive for COVID-19, which was fifteen inmates.  (*Id.*).  Two of those inmates had died of the virus.  (*Id.*).

On April 6, 2020, Foreman's cellmate was transferred to E-block after going to sick call and displaying signs and symptoms of suspected COVID-19.  Foreman, now suspected of having been exposed to COVID-19, was summoned to the medical unit, given a temperature check, and told he would be transferred to the SHU and medically isolated for 14 days.  Prior to COVID-19, the SHU was

6

primarily used to detain inmates who had violated BOP policies or were in

protective custody.  Because it was a high security area, the SHU had more

stringent rules than other parts of the prison.  As such, Foreman testified that he

was handcuffed and forced to strip and change into a jumpsuit and flipflops.  He

also said that his mask was taken from him, he did not have access to sanitizer, and

that there was standing water everywhere.  (ECF No. 81-3, PageID.1277, 1281-

1283).  Foreman appears to take issue with the stated reason for being sent to the

SHU: at his deposition, he testified that he did not have a temperature above 100

degrees but was still required to go to the SHU due to potential exposure to

COVID-19 from his cellmate.  (*Id.*, PageID.1277-1278).

Medical records reflect that on April 8, 2020, Foreman was moved from the

SHU to the E-Block after becoming symptomatic.  He complained of chills, body

pain, and had a 102.8 temperature.  Foreman had suffered from these complaints

for two days.  The assessment was cold symptoms.  The following day, April 9,

2020, Weaver saw Foreman and documented that he still did not feel well and had

a 103.5 temperature but denied shortness of breath or cough.  The assessment was

changed to influenza-like illness.  (ECF No. 81-4, PageID.1513-1515).

In a sworn declaration submitted by the Government, Weaver recalled that

late in the day of April 9, 2020, Foreman was having problems tolerating food,

suffered from nausea, and had generally not been taking in an adequate amount of

fluids.  Foreman's vital signs indicated that he was dehydrated, so Weaver placed

him on an IV.  (ECF No. 81-5, PageID.1631).  As noted above, Foreman alleges

that Weaver told him that she would inform the guard to keep an eye on Foreman.

(ECF No. 1, PageID.9).  Foreman said that before Weaver left, he asked her not to

leave and said that he felt like he was dying.  (*Id.*).  Weaver did not recall telling

Foreman that she would inform a guard to monitor him but did recall that Foreman

was not in distress when she left.  (ECF No. 81-5, PageID.1631).  Weaver testified

that had Foreman's condition required hospitalization, she would have had him

hospitalized on April 9, 2020, but it did not.  (*Id.*).

Foreman disagrees with Weaver's testimony.  According to Foreman's

sworn declaration that he submitted with his response to the Government's motion,

Weaver did in fact tell him she would alert the guard on duty to his condition.

(ECF No. 90, PageID.1997).  Foreman also says that he was in clear distress when

Weaver left, telling Weaver that his whole body was cold, he could hardly breathe,

and it felt like he was dying.  (*Id.*, PageID.1997-1998).

On the night of April 9, 2020, after Weaver had left the unit, Foreman

testified that his condition worsened.  Foreman said that he was having trouble

breathing and called over a guard, "Officer Patton," who spoke with him when he

first made the request to call a lieutenant but ignored his subsequent requests.

Defendants note that Foreman acknowledged that a guard normally has no

obligation to call a lieutenant when a prisoner requests it.  (ECF No. 81-3, PageID.1304-1313).

Foreman also testified that the guard said Weaver had not discussed Foreman's medical problems with him or asked the guard to keep an eye on Foreman.  Foreman said he was up until at least 5 a.m. the next morning.  (*Id.*).

Weaver arrived on E-Block around 6:30 a.m. on April 10.  When she arrived, other inmates suggested that she see Foreman first.  According to Weaver, Foreman was conscious when she entered the cell, sitting on the floor, and able to speak with Weaver.  His vital signs were stable.  (ECF No. 81-5, PageID.1631).  Foreman asserts that he was initially unconscious when Weaver came and does not remember anything until he was touched several times, after which he fell down and his IV came out.  (ECF No. 90, PageID.1959).

Medical records show that Foreman had a 101.6 temperature and an altered mental state.  (ECF No. 81-4, PageID.1511).  Weaver noted that Foreman was frightened and "not oriented to time or place[.]"  (*Id.*).  Weaver declared that she was aware of cases where a COVID-19 infection was suspected to have caused delirium or a change in mentation.  (ECF No. 81-5, PageID.1631).  Because Foreman had an acute mental status change, Weaver called an ambulance so that Foreman could be transported to the hospital and evaluated.  (*Id.*).

Weaver could not say how much time passed between her evaluation of Foreman and the call for emergency medical services. The process at that time to get Foreman to the emergency room required her to call Trinity Health System for triage prior to transfer, which involved giving a formal oral report to hospital staff. (*Id.*, PageID.1632). Records indicate that an ambulance was dispatched to FCI Milan at 8:15 a.m. (ECF No. 81-6). Foreman's breathing was labored with diminished lung sounds bilaterally; his skin was hot, but his airway was patent (open and allowing for airflow). (*Id.*). He was transported without incident to the requested facility, and the ambulance did not engage lights or sirens during transportation. (*Id.*).

Defendants have also attached Foreman's emergency room records to their motion. Those records show that Foreman presented with two to three weeks of fever, chills, and a cough, plus a sudden, sharp abdominal pain as of the day prior. Foreman denied chest pain or shortness of breath despite being hypoxic (lacking enough oxygen at the tissue level) and required two liters of oxygen via the nasal cannula. (ECF No. 81-7, PageID.1648). He was also given fluids and was "likely suffering from a coronavirus infection[.]" (*Id.*, PageID.1651). Testing confirmed that Foreman had become infected with COVID-19. (ECF No. 81-8, 81-9).

Foreman's condition deteriorated on April 11, 2020, culminating with him being intubated and admitted to the medical intensive care unit (MICU):

> During the course of [Foreman's] stay his respiratory status continued to worsen significantly with increased oxygen requirement requiring placement on high flow nasal cannula due to hypoxia in the 60s however patient continued to have increased work of breathing even after he was switched to BiPAP therefore he was intubated for increased work of breathing.

(ECF No. 81-10, PageID.1657).  Later that day, he underwent an emergency intubation after being sedated for the procedure.  (ECF No. 81-11).

Foreman ultimately spent eighteen days in intensive care.  (ECF No. 81-12). He was diagnosed with acute hypoxic respiratory failure due to COVID-19.  (*Id.*). He was initially taken off of the respirator on April 23, 2020, but had to be re-intubated overnight and was not taken off of the respirator for good until April 27, 2020.  (*Id.*).  The discharge note stated that Foreman would require skilled physical and occupational therapy once discharged.  (*Id.*, PageID.1665).

Foreman began receiving physical and occupational therapy on April 27, 2020, having deficits including decreased cognition, endurance, functional mobility, and fatigue.  (ECF No. 81-13, PageID.1670).  The occupational therapist also noted that Foreman "may need prison infirmary at discharge[.]"  The initial OT assessment projected that he would have OT two times per week and estimated that the OT goals were expected to end or be met by May 4.  (*Id.*, PageID.1670-1671).  His physical therapy assessment showed decreased strength, endurance, and cognition, as well as weakness, and his physical therapist recommended two to three sessions per week and laid out three goals that expected to end or be met by

11

May 4 and May 11.  (*Id.*, PageID.1674-1675).  Foreman received physical and occupational therapy on April 29 and May 1, 2020.  (*Id.*, PageID.1677-1692).

May 1 therapy notes anticipated Foreman's discharge.  The occupational therapy note states: "Therapist recommending short distance mobility within patient's cell upon return to prison and recommending SBA for longer distance mobility due to decreased balance/endurance.  At this time, patient does not require further acute OT, will sign off."  The note continued, "OT-OK to Discharge: Yes[.]"  (*Id.*, PageID.1689).   The physical therapy note documented that Foreman was independent in his ability to sit, sit to stand, and that he was walking without an assistive device thirty to forty feet, but also noted, "Patient is below baseline for mobility.  If patient is discharging, will need to limit walking distance to 40-50 ft and will need close supervision due to fall risk.  Information communicated to RN and correctional staff."  (*Id.*, PageID.1691).  Foreman's goals were adjusted to be met on May 6 and May 11, 2020.  (*Id.*, PageID.1692).

Upon returning to FCI Milan, Foreman was again housed in E-Block with inmates suffering from, or recovering from, COVID-19.  (ECF No. 81-4, PageID.1463).  He was feeling better but said he had lost several pounds and was still weak.  He was able to stand up without support but was transferred to E-Block in a wheelchair.  He did not report being in any distress.  (*Id.*).

C.    Procedural History

12

On June 21, 2022, Hemingway filed a motion to dismiss, arguing that Foreman failed to state a viable claim under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).  The undersigned issued a report and recommendation (R&R), recommending that the motion be granted in part and denied in part.  (ECF No. 29).  Specifically, the undersigned recommended that Foreman's claims relating to his conditions of confinement were not viable under *Bivens*, but his claim of deliberate indifference to serious medical needs should proceed.  (*Id.*).  The district court adopted the R&R over Hemingway's objections.  (ECF No. 38).

Weaver then filed a motion to dismiss, (ECF No. 44).  The undersigned issued an R&R recommending that the motion be granted.  (ECF No. 87).  The district court adopted the R&R and Weaver was dismissed.  (ECF No. 93).

After the close of discovery, which was extended twice, the remaining defendants are the Government, Hemingway, and Patton.  The following motions are pending:

- The Government's motion for summary judgment (ECF No. 81)

- Hemingway's motion for summary judgment (ECF No. 83)

- Foreman's motion for leave to file amended declaration (ECF No. 95)

- Foreman's third motion for leave to amend (ECF No. 101)

- Foreman's motion to join two federal employees (ECF No. 105)

13

On March 6, 2024, the Court stayed all proceedings until the pending motions have been resolved.  (ECF No. 107).  The stay will remain in place until this R&R is ruled on by the district judge, with the exception that the parties may file objections to the R&R, including response and reply briefs.

### III.   *Sua Sponte* Dismissal of Patton

As noted above, Patton does not appear to have been served, and Foreman's third motion to amend the complaint seeks to substitute Patton with a new defendant, Officer Patterson.  (ECF No. 101, PageID.2460).

Fed.R.Civ.P. 4(m) requires that service of process be made within 120 days of filing the complaint:

> If service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint, the court, upon motion or on its own initiative after notice to the plaintiff, shall dismiss the action without prejudice as to that defendant or direct that service be effected within a specified time; provided that if the plaintiff shows good cause for the failure, the court shall extend the time for service for an appropriate period.

*See also Spruce v. Chase Bank*, No. 13-CV-10711, 2014 WL 4145340, at *2 (E.D. Mich. Aug. 20, 2014).

A court may exercise its discretion to extend the time for service without a showing of good cause, but *must* extend the time if good cause is shown.  *Id.*

Here, the Government informed Foreman and the Court on July 11, 2022, that there was no record of an Officer Patton working at FCI Milan.  (ECF No. 17).

14

Foreman has been unsuccessful in attempts to serve Patton, and has made late attempts to substitute Patton with various other officials, which will be discussed below.

There being no apparent reason to keep Patton—whom the parties appear to agree is not the correct defendant—in the case, the undersigned recommends *sua sponte* dismissal of Patton for Foreman's failure to serve him within the time limits set forth in Rule 4(m). *See id.*

## IV.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party." *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004).

"The moving party has the initial burden of proving that no genuine issue of material fact exists. . . ." *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotation marks omitted); cf. Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of

15

fact," the court may "consider the fact undisputed for purposes of the motion").

"Once the moving party satisfies its burden, 'the burden shifts to the nonmoving

party to set forth specific facts showing a triable issue.' "  *Wrench LLC v. Taco*

*Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus.*

*Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The fact that Foreman is *pro se* does not reduce his obligations under Rule

56.  Rather, "liberal treatment of pro se pleadings does not require lenient

treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338,

344 (6th Cir. 2006).  Additionally, "once a case has progressed to the summary

judgment stage, as is true here, the liberal pleading standards under the Federal

Rules are inapplicable." *J.H. v. Williamson Cnty.*, 951 F.3d 709, 722 (6th Cir.

2020) (quoting *Tucker v. Union of Needletrades, Indus., & Textile Employees*, 407

F.3d 784, 788 (6th Cir. 2005)) (cleaned up).

## V.     Discussion

A.     The Government's Motion for Summary Judgment (FTCA Claims)

Sovereign immunity generally bars claims against the United States without

its consent. *United States v. Orleans*, 425 U.S. 807, 814 (1976).  Congress,

through the FTCA, has waived sovereign immunity for most tort claims.  28

U.S.C. § 1346(b)(1).  The FTCA's waiver is limited, however, and contains a

series of exceptions. *Id.* § 2680.  The Government argues that two relevant

exceptions should result in summary judgment in its favor on some of Foreman's claims.  As for his remaining claims, the Government argues that there is no genuine issue of material fact that could render the Government liable on those claims.  Each argument will be addressed in turn below.

### 1.   Discretionary Function Exception

#### a.   Standard

The Government argues that some of Foreman's claims are barred by the discretionary function exception to the FTCA.  The discretionary-function exception holds that the FTCA's waiver does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."  28 U.S.C. § 2680(a).  "If a claim falls within this exception, federal courts lack subject-matter jurisdiction, and the claim must be dismissed."  *Kohl v. United States*, 699 F.3d 935, 939-40 (6th Cir. 2012).

"Determining whether a claim falls within the discretionary-function exception involves a two-step test."  *Id.* at 940.  "The first step requires a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice."  *Id.* (cleaned up).  "If there was such a violation of a mandatory regulation or policy, then the

discretionary-function exception will not apply, because there was no element of judgment or choice, and thus the employee has no rightful option but to adhere to the directive." *Id.* (cleaned up).

"If, on the other hand, there was room for judgment or choice in the decision made, then the challenged conduct was discretionary." *Id.* If so, courts move to the second step of the test, which asks "whether the conduct is 'of the kind that the discretionary function exception was designed to shield' " from liability. *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (quoting *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991)). "Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (cleaned up).

### b.    Application

Foreman's claims against the Government are based on the allegations that the Government improperly placed in medical isolation; failed to provide a mask or sanitizing items in the SHU; and failed to conduct adequate intake examinations for new inmates during the COVID-19 outbreak in March and April 2020. (ECF No. 1, PageID.14, 19-20, 22). The Government says that all of this conduct falls

under step one and step two of the discretionary-function test and therefore the Government is exempt from liability on Foreman's FTCA claims.

At step one, it says that "there was no federal statute, regulation, or policy that '*specifically* prescribe[d] a course of action' with respect to the challenged conduct."  (ECF No. 81, PageID.1174 (citing *Berkovitz by Berkovitz v. United States*, 486 U.S. 531, 536 (1988)) (emphasis added)).  The complaint cites 18 U.S.C. § 4042(a)(2)-(3), which requires the Bureau of Prisons to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and "provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States[.]"  But the duties imposed by § 4042 are general, broad objectives that require discretion in deciding how to accomplish them.  *Montez ex rel. Est. of Hearlson v. United States*, 359 F.3d 392, 396 (6th Cir. 2004); *Rich v. United States*, 811 F.3d 140, 145 (4th Cir. 2015).

In response, Foreman cites 28 C.F.R. § 549.10, which requires the Bureau of Prisons to "manage infectious diseases in the confined environment of a correctional setting through a comprehensive approach which includes testing, appropriate treatment, prevention, education, and infection control measures."; and "BOP Program Statement 6190," which is a directive related to HIV testing and pre-test counseling, *see* ECF No. 90, PageID.1989-1991.  However, neither source

19

amounts to a mandatory, non-discretionary rule for handling the COVID-19 pandemic, as one court has already found.  *See Murillo v. United States Dep't of Just.*, No. CV 21-00425-TUC-CKJ, 2022 WL 16745333, at *8 (D. Ariz. Nov. 7, 2022) (concluding that 28 C.F.R. § 549.10 "does not prescribe any specific course of conduct [the Bureau of Prisons] must take to achieve management of infectious diseases in its facilities" and that Program Statement 6190.04 "predates the COVID-19 pandemic by six years" and does not prescribe a specific course of action that leaves "no room for choice or judgment.").  The *Murillo* court reasoned that based on the language of these sources, both permit officials to make discretionary decisions in addressing infectious disease management.  The undersigned agrees with the holding in *Murillo*.  Therefore, § 549.10 and BOP Program Statement 6190 do not preclude the Government from relying on the discretionary-function exception to the FTCA in support of its motion for summary judgment.

Foreman also argues that Hemingway's interrogatory responses show a mandatory plan to provide disinfectant and face masks and quarantine certain inmates, and that these mandatory rules were violated in his case.  (ECF No. 90, PageID.1962-1963).  The Government argues that these responses do not establish a mandatory rule that was in place at the time of Foreman's allegations.  (ECF No. 92, PageID.2066-2067).  The Government is correct that Hemingway's responses

do not indicate whether it was mandatory to provide disinfectant and face masks and to quarantine inmates at the time of his related allegations, which occurred on April 6 and 7, 2020.  In fact, the Government cites the Department of Justice's "Capstone Review" of the response to the COVID-19 pandemic, which shows that although there was guidance issued to Wardens regarding face coverings for inmates on April 6, 2020, the "Mandatory Use of Face Coverings" was not issued until a few days later, on April 15, 2020.  (ECF No. 92-1, PageID.2160).

Ultimately, Hemingway's discovery responses and the "Capstone Review" support the Government's argument that its actions fall under the ambit of discretionary function.  Similar findings have been made regarding the Bureau of Prisons' response to the COVID-19 pandemic across the country.  *See Farmer v. United States*, No. 0:21-CV-2572-TMC, 2023 WL 3477239, at *3 (D.S.C. May 16, 2023); *Brown v. United States*, No. 3:22-CV-124, 2023 WL 5167251, at *11 (N.D.W. Va. Apr. 28, 2023), *report and recommendation adopted*, 2023 WL 4744597 (N.D.W. Va. July 25, 2023); *Hatten v. United States*, No. CV 4:21-2912-JFA-TER, 2023 WL 2815335, at *6 (D.S.C. Jan. 24, 2023), *adopted*, 2023 WL 2495870 (D.S.C. Mar. 14, 2023); *Sanford v. United States*, No. 0:21-CV-02552-RMG, 2022 WL 17369375, at *3 (D.S.C. Dec. 2, 2022), *aff'd*, 2023 WL 4181333 (4th Cir. June 26, 2023); *Bell v. United States*, No. 3:21-CV-148, 2022 WL

19517285, at *9 (N.D.W. Va. Aug. 12, 2022), *adopted*, 2023 WL 2730660 (N.D.W. Va. Mar. 31, 2023).

Having shown that its actions were discretionary, the Government must also show that they were grounded in public policy.  *Gaubert*, 499 U.S. at 323. Foreman does not address this point, but it is clear that FCI Milan's COVID-19 response is precisely the type that courts are not meant to second-guess.  Decisions concerning "where to place inmates and whether to keep certain individuals . . . separated" invoke several policy considerations for prison officials and "are precisely the kind of determinations that the discretionary function exception is intended to protect."  *Rich*, 811 F.3d at 146; *see also L. C. v. United States*, 83 F.4th 534, 543 (6th Cir. 2023) (holding that the test is whether the challenged actions are susceptible to policy analysis).

Again, other district courts have found that the COVID-19 responses in federal prisons are exactly the kinds of discretionary decisions that are susceptible to policy analysis and, therefore, the kinds that the discretionary function exception is intended to protect.  *See, e.g.*, *Busara v. United States*, No. 2:21-CV-4055, 2023 WL 4946460, at *7 (W.D. La. Apr. 27, 2023), *adopted sub nom. Busara v. USA*, 2023 WL 4938479 (W.D. La. Aug. 2, 2023) ("The difficult task of responding to a global pandemic is precisely the type of scenario grounded in social, economic, and political policy that Congress intended to immunize" (cleaned up)); *Farmer v.*

22

*United States*, No. 0:21-CV-2572-TMC, 2023 WL 3477239, at *3 (D.S.C. May 16, 2023) (finding that the defendants' "failure to follow its own COVID protocols" fell under the discretionary function exception).

Because the claims described in this section fall under the discretionary function exception to the FTCA, the Government should be granted summary judgment on Foreman's claims that the Government improperly placed in medical isolation; failed to provide a mask or sanitizing items in the SHU; and failed to conduct adequate intake examinations for new inmates during the COVID-19 outbreak in March and April 2020.

### 2.     Quarantine Exception

The Government also says that it is exempt based on the quarantine exception to FTCA liability.  It is not necessary to address this defense because the same claims are barred by sovereign immunity under the discretionary-function exception to the FTCA, as discussed above.  However, the Government's argument will be addressed for the sake of completeness.

The FTCA includes an exception for any damages related to the establishment of a quarantine.  28 U.S.C. § 2680(f) forecloses "[a]ny claim for damages caused by the imposition or establishment of a quarantine by the United States."  This "immunizes the Government from suit for damages proximately caused by the decision whether to impose a quarantine and any actions undertaken

23

by the Government to carry out the purposes of the quarantine. . . . even if it acts

negligently in carrying out the quarantine." *Wallace v. United States Dep't of*

*Just.*, No. 5:21-CT-3035-D, 2021 WL 2853692, at *2 (E.D.N.C. June 24, 2021),

*aff'd*, 2022 WL 1024613 (4th Cir. Apr. 6, 2022); *see also Brown v. United States*,

No. 3:22-CV-124, 2023 WL 5167251, at *13 (N.D.W. Va. Apr. 28, 2023), *report*

*and recommendation adopted,* No. 3:22-CV-124, 2023 WL 4744597 (N.D.W. Va.

July 25, 2023)

> Further, the BOP, like the rest of the country, indeed the world, imposed
> a quarantine on or around March 2020, to address the global COVID-
> 19 pandemic.  The imposition of a quarantine is expressly listed in 28
> U.S.C. § 2680(f) as an area where the Government maintains its
> sovereign immunity. Accordingly, . . . [Plaintiff's] claim is still subject
> to dismissal, because the Government maintains sovereign immunity.

Foreman contends that the quarantine exception does not apply to a prison's

treatment of inmates during the COVID-19 pandemic.  In support, he cites two

cases, *Ates v. United States*, No. 2:21-CV-00418-JPH-MG, 2023 WL 1765991, at

*5 (S.D. Ind. Feb. 2, 2023) and *Pressley v. United States*, No. 2:21-CV-00202-

JMS-MG, 2023 WL 22192, at *4 (S.D. Ind. Jan. 3, 2023).  In both cases, the courts

noted that prior to *Wallace*, this exception has never been applied outside of the

context of livestock quarantines.  The *Pressley* court acknowledged that there is

little caselaw applying the quarantine exception to humans, and the *Ates* court

noted that the plaintiff in *Wallace* did not raise this objection to applying the

quarantine exception to his case.  2023 WL 22192, at *4; 2023 WL 1765991, at *5.

24

At least one other case, *Stegemann v. United States*, No. 921CV0949MADML, 2023 WL 2864715, at \*18 n.19 (N.D.N.Y. Feb. 9, 2023), *report and recommendation adopted in part, rejected in part*, 2023 WL 2643504 (N.D.N.Y. Mar. 27, 2023), has also questioned the applicability of § 2680(f) to an inmate's conditions of confinement outside of the livestock quarantine context.

On the other hand, a district court in New Jersey found that the limitation to livestock quarantines did not fit the text of the FTCA waiver, noting that *Black's Law Dictionary*, 1362 (9th ed. 2009) defined quarantine as "isolation of a *person* or animal afflicted with a communicable disease or prevention of such a *person* or animal from coming into a particular area, the purpose being to prevent the spread of disease." *Thieme v. United States*, No. CV 21-682 (RMB-AMD), 2023 WL 2584102, at \*9 (D.N.J. Mar. 21, 2023) (emphasis added). *Thieme* held that although the statute was not limited to livestock quarantines, the plaintiff's allegations still did not fall under the exception. This was because

> Plaintiffs [did] not allege they were harmed by Defendants' acts in carrying out a quarantine; for example, that they were harmed by the quarantine lock-down conditions imposed on them. Rather, Plaintiffs' damages [were] based on the Government's alleged failure to impose *stricter* quarantine protocols to prevent them from becoming infected with COVID-19.

*Id.* (emphasis added).

Here, the undersigned finds *Thieme* to be both the most convincing authority on § 2680(f) and the most applicable set of facts to Foreman's claims. The

undersigned agrees that the most reasonable interpretation of the quarantine exception does apply to human quarantines, but also agrees that the exception applies to affirmative quarantine actions that cause harm, not harm that is caused by a failure to impose stricter quarantine protocols than those imposed.

In sum, if the Court chooses to rule on the quarantine exception, the undersigned recommends that this defense be denied because Foreman's claims do not fall squarely under the exception for "actions undertaken by the Government to carry out the purposes of the quarantine." *Wallace*, 2021 WL 2853692, at *2.

### 3.   Medical Malpractice Claims

Foreman asserts five medical malpractice claims in the complaint:

(1) Medical personnel improperly placed Foreman in the SHU despite not having a temperature or Covid-19 symptoms;

(2) Foreman was not provided with a mask or "sanitizing items" in the SHU;

(3) Weaver should have treated his dehydration with bottled water rather than an IV;

(4) Weaver failed to inform a guard of his medical condition prior to leaving for the day; and,

(5) Weaver delayed calling an ambulance to take Foreman to the hospital for between 45 minutes and one hour while she wrote a report.

(ECF No. 1, PageID.18-20).

The Government argues that summary judgment is appropriate on all of these claims because Foreman has not offered the mandatory expert testimony required to prove such claims.

### 1.      Standard

The FTCA directs that the government's liability in tort is determined in accordance with "the law of the place where the act or omission occurred."  28 U.S.C. §1346(b); *Schindler v. United States*, 661 F.2d 552, 558-59 (6th Cir. 1981).

To establish a cause of action for medical malpractice in Michigan, a plaintiff must establish four elements: (1) the medical standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the injuries were the proximate result of the defendant's breach of the applicable standard of care.  *Locke v. Pachtman*, 446 Mich. 216, 222 (1994), *see also* M.C.L. § 600.2912a.  A plaintiff is required to present expert testimony "to establish the standard of care and to demonstrate the defendant's alleged failure to conform to that standard."  *Decker v. Rochowiak*, 287 Mich.App 666, 685 (2010); *Koch v. Gorrilla*, 552 F.2d 1170, 1174 (6th Cir. 1977).

Expert testimony "is essential to establish a causal link between the alleged negligence and the alleged injury."  *Pennington v. Longabaugh*, 271 Mich. App. 101, 104 (2006).  "Absent the production of this requisite expert testimony as to

27

the elements of medical malpractice, the plaintiff fails in its burden of establishing

a prima facie case of liability[.]"  *Wallace v. Garden City Osteopathic Hosp.*, 111

Mich. App. 212, 217 (1981), *rev'd on other grounds*, 417 Mich. 907 (1983).

2.    Application

It is clear that Foreman has not retained an expert to testify to his medical

malpractice claims.  Foreman, however, argues that, under *Plescia v. United States*,

No. 13-14347, 2015 WL 13743549, at *5 (E.D. Mich. June 17, 2015), *report and

recommendation adopted*, 2016 WL 304536 (E.D. Mich. Jan. 26, 2016), he was

not required to produce expert testimony because the Government has not properly

supported its motion for summary judgment with an expert of its own.  In *Plescia*,

the court, relied on *Fitzgerald v. Corr. Corp. of Am.*, 403 F.3d 1134, 1144–45

(10th Cir. 2005), in which the Tenth Circuit stated that the plaintiff was not

required to produce an expert because the defendant's expert's affidavit was

conclusory and insufficient to support a motion for summary judgment.  The Court

in *Plescia* held that even if the rule in *Fitzgerald* were applicable, the plaintiff was

required to produce expert testimony to support his medical malpractice claims

because the defendant *had* properly supported its motion for summary judgment.

Foreman's reliance on *Plescia* is misplaced.  First, *Fitzgerald* applied

Oklahoma law, not Michigan law.  Second, although the Government argues that

*Plescia* misapplies Michigan law, *Plescia* can be read as saying that even if the

rule in *Fitzgerald* applied, the plaintiff would have been required to produce expert testimony. This is the most natural reading of *Plescia*, as it squares the case with Michigan law and Sixth Circuit interpretations of that law, which hold that "[a]s a general rule, Michigan courts require expert testimony in medical-malpractice cases, particularly for establishing the applicable standard of care and causation." *Kava v. Peters*, 450 F. App'x 470, 475 (6th Cir. 2011). As such, *Plescia* does not support Foreman's argument that he does not need an expert to bring his medical malpractice claims under Michigan law.

Foreman also argues that expert testimony is not required if a defendant mistakenly treated or did injury to a portion of the body that was free of disease and not designated for treatment. *Sullivan v. Russell*, 338 N.W.2d 181 (Mich. 1983) (expert testimony unnecessary where a dentist mistakenly ground three healthy teeth). In his response, Foreman says that a nurse practitioner mistakenly treated him for dehydration. However, this assertion is contrary to his complaint, in which is alleges that he was in fact dehydrated, and the medical record, which indicates dehydration. (ECF No. 1, PageID.9; ECF No. 81-5, PageID.1631). Further, his claim his not based on unnecessarily being treated for dehydration, which would be parallel to *Sullivan*; it is that he was inadequately treated for COVID-19 symptoms. This is exactly the sort of claim that requires a medical expert in order to pursue.

29

Foreman next says that he can proceed relying on the testimony of his treating physicians, citing *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004). *Gil* is merely influential at best, as it is a Seventh Circuit case applying Wisconsin law to that plaintiff's medical malpractice claim. But even under that rule, Foreman has failed to designate and properly disclose the treating physicians as experts in this case, which is required. *See* Fed. R. Civ. P. 26(a)(2), 37(c); *R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 270 (6th Cir. 2010).

Finally, Foreman argues that he could proceed under a theory of *res ipsa loquitor* without an expert witness, citing *Locke*, 446 Mich. 216. Under *Locke*, the four factors are necessary to a *res ipsa loquitur* claim:

(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence;

(2) it must be caused by an agency or instrumentality within the exclusive control of the defendant;

(3) it must not have been due to any voluntary action or contribution on the part of the plaintiff[; and,]

(4) [e]vidence of the true explanation of the event must be more readily accessible to the defendant than to the plaintiff.

*Id.* at 230.

"In the medical malpractice context, the crucial element, and that most difficult to establish, will often be the first factor, i.e., that the event is of a kind that does not ordinarily occur in the absence of negligence." *Id.* at 230-31. "Therefore, the fact that the injury complained of does not ordinarily occur in the absence of negligence must either be *supported by expert testimony* or must be *within the common understanding of the jury*." *Id.* at 231 (emphasis added).

Foreman's claims do not satisfy the first prong. While there is a genuine issue of fact as to whether Weaver's actions caused him harm, he cannot show that this would not have happened in the absence of negligence. Weaver testified that she followed the required procedures in order to have Foreman transferred to the hospital, and there is no evidence that he was harmed by any delay or that the delay was negligent. In this case, an expert's opinion would be necessary in order to proceed on this theory.

### 4.  Common Negligence

Foreman's remaining claims fall under the umbrella of common law negligence. The Government accurately summarizes the claims as follows:

(1) nurse practitioner Weaver should have treated his dehydration with bottled water rather than an IV;

(2) that Weaver failed to inform a guard of his medical condition prior to the nurse practitioner leaving for the day;

31

(3) that Weaver delayed calling an ambulance to take Foreman to the

hospital for between 45 minutes and one hour while she wrote a report;

(4) that Hemingway removed Foreman from the hospital against a

physician's recommendation and denied him rehabilitative care;

(5) that Hemingway failed to permit protective masks to be worn in the

SHU; [and,]

(6) that a guard disregarded Foreman's medical needs when the guard

refused to call a lieutenant after medical staff had departed for the

evening.

(ECF No. 81, PageID.1181).

### a.    Standard

To prevail on a claim of negligence under Michigan law, a plaintiff must

show that (1) "the defendant owed a legal duty to the plaintiff," (2) "the defendant

breached or violated the legal duty," (3) "the plaintiff suffered damages," and (4)

"the breach was a proximate cause of the damages suffered." *Biegas v. Quickway

Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009) (cleaned up).

### b.    Application

Regarding Foreman's remaining claims against Weaver, these must fail

because they sound in medical malpractice, not ordinary negligence. The

substance of an allegation determines whether a claim is evaluated as a medical

malpractice claim or a negligence claim. *Albright v. Christensen*, 24 F.4th 1039, 1043 (6th Cir. 2022). A court must ask " 'whether the claim pertains to an action that occurred within the course of a professional relationship' " and " 'whether the claim raises questions of medical judgment beyond the realm of common knowledge and experience.' " *Id.* at 1043-44 (quoting *Bryant v. Oakpointe Villa Nursing Ctr.*, 684 N.W.2d 864, 871 (2004)). When a provider's actions require "understanding and consideration of the risks and benefits" of a medical action, the claim sounds in medical malpractice. *Id.* at 875.

Here, Weaver's decisions to employ an IV, to not require medical monitoring, and her evaluation of the acuity of Foreman's need for care are decisions that occurred in the course of a professional relationship and required the application of medical judgment that a lay person does not possess. These are medical malpractice claims, not ordinary negligence. Foreman argues that there is an issue of fact whether Weaver informed him that she would have a guard monitor him before leaving on April 9, 2020, but this fact is immaterial. The parties agree she did not inform a guard to monitor Foreman, and the decision whether to do so involved an application of medical judgment beyond the realm of common knowledge and experience. As discussed above, such decisions sound in medical malpractice and would require expert testimony for a trier of fact to consider. As such, they fail as ordinary negligence claims.

Foreman's negligence claims regarding Hemingway must also fail, as they are not supported by evidence.  Foreman alleges that Hemingway ordered Foreman to be returned to FCI Milan before his physical and occupational therapy were completed.  This is not borne out by any admissible evidence.  As summarized above, hospital records indicate that Foreman was deemed ready to be released by the hospital staff, *see* ECF No. 81-13, PageID.1689-1692, and Weaver's declaration says that Hemingway was not involved in day-to-day inmate treatment decisions, ECF No. 81-5, PageID.1632.  This is supported by Hemingway's response to Foreman's interrogatories, in which Hemingway states that he "had no personal involvement in approving or disapproving any aspect of [Foreman's] medical treatment, including – but not limited to – approving or disapproving specific expenditures related to his care."  (ECF No. 81-14, PageID.1709-1710).

To rebut this, Foreman says that his doctor told him he would order or recommend that Foreman be treated for thirty days before being discharged, and that this is corroborated by Foreman's mother's notes.  (ECF No. 89, PageID.1845).  He also says he would testify that he was told by an unidentified FCI Milan officer that Hemingway refused to pay anymore medical bills, which caused Foreman to be discharged back to FCI Milan early.  (*Id.*, PageID.1849).  This is not enough to overcome the evidence presented by the Government that it was not responsible for Foreman's allegedly early discharge.  Foreman's

34

recollection of what he was told is not reflected in the medical record, which states that he was ready for discharge on May 1, 2020.  Further, Foreman's evidence that Hemingway decided to stop paying for Foreman's care is inadmissible hearsay. Hearsay is any statement that (i) a declarant "does not make while testifying at the current trial" and that (ii) is offered into evidence "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Foreman has not identified a hearsay exception or exclusion that would allow him to base his claims on what he was told by an officer at FCI Milan.  *See United States v. Day*, 789 F.2d 1217, 1221 (6th Cir. 1986) ("The proponent of a hearsay statement bears the burden of proving each element of a given hearsay exception or exclusion.").

Foreman also fails—on his claims involving Hemingway and the on-duty guard on April 8 and 9, 2020—to show causation or damages.  Foreman alleges that he contracted COVID-19 due to the housing conditions at FCI Milan and being denied a mask, but as the Government argues, there is "simply no knowing when, or how, or from whom Foreman contracted Covid-19," and "attempting to make such an argument would again require expert medical testimony, which Foreman cannot bring forward."  Further, there is no admissible evidence to show that an FCI Milan's guard failing to monitor Foreman or that any delay in Foreman being sent to the hospital caused Foreman any harm that would not have otherwise occurred.  This is simply not borne out in the medical records and would require

expert testimony to prove.  Similarly, Foreman has no evidence that his allegedly early discharge from the hospital caused any damages.  Foreman cites an article from a licensed therapist outlining the struggles an ICU patient may face when returning home, which says that patients may still struggle with breathing, muscle weakness, fatigue, foggy thinking, and nerve pain.  (ECF No. 89, PageID.1851).  However, this is a general statement that is not applied specifically to Foreman and would not be admissible, on its own, to show damages.  It also does not speak to whether the timing of Foreman's discharge led to any damages that he would not have otherwise faced.  Foreman simply does not have the evidence required to proceed on these negligence claims, and the Government should be granted summary judgment.

### B.  Hemingway's Motion for Summary Judgment

#### 1.  *Bivens* Claim

Hemingway moves for summary judgment on the *Bivens* claim that remains against him after his previous motion to dismiss was granted in part.  (ECF No. 38).  The remaining claim is that Hemingway ordered Foreman to be discharged from the hospital before his therapy and recovery from COVID-19 were complete.  In his motion, however, Hemingway spends much of his brief asking the undersigned to reconsider the decision that Foreman's deliberate indifference claim is cognizable under *Bivens*.  The undersigned declines to do so.

36

As the district judge noted in adopting the undersigned's prior R&R, *Carlson v. Green*, 446 U.S. 14 (1980) "created 'a claim of deliberate indifference to a prisoner's medical needs brought against federal prison officials under the Eighth Amendment.' "  (ECF No. 38, PageID.440 (quoting *Enriquez-Perdomo v. Newman*, 54 F.4th 855, 867–68 (6th Cir. 2022)); *see also Greene v. United States*, No. 21-5398, 2022 WL 13638916, at *3 (6th Cir. Sept. 13, 2022) ("*Bivens* claims are currently limited to three situations: 1) a Fourth Amendment claim against federal narcotics agents for an illegal seizure, 2) a Fifth Amendment claim against a member of Congress for sex discrimination, and 3) an Eighth Amendment claim against prison officials for inadequate medical care.").  This characterization has also been adopted by other circuit courts.  (*Id.* (citing *Montalban v. Samuels*, No. 21- 11431, 2022 WL 4362800, at *3 (11th Cir. Sept. 21, 2022); *Hampton v. Jones*, No. 21-2880, 2022 WL 4820355, at *3 (3d Cir. Oct. 3, 2022); *Alsop v. Fed. Bureau of Prisons*, No. 22-1933, 2022 WL 16734497, at *2–3 (3d Cir. Nov. 7, 2022)).  All of these decisions came down after *Egbert v. Boule*, 142 S. Ct. 1793, 1803-04 (2022), the Supreme Court's latest declaration of the limitations of applying *Bivens* to new contexts.

Hemingway's requested level of granularity is not supported in this or other circuits.  However, even assessing Foreman's allegations at a more granular level, the cases do not differ in any way that would limit Foreman's ability to pursue a

*Bivens* claim under the cause of action recognized in *Carlson*.  As the district court in this case stated:

> [T]here are some differences between Foreman's claim and the claim in arlson, but none are meaningful.  True, COVID-19 is a novel disease in many ways compared to a disease like asthma.  But Foreman's medical-indifference claim is not about treating COVID-19.  It is about receiving less than the doctor recommended rehabilitative treatment in his recovery from COVID-19.  So the novelty of the disease has little to do with his claim; prison officials were told how to treat Foreman— they just ignored the recommendation.  And though Foreman fortunately did not suffer the same extent of injury as the plaintiff in *Carlson*, the Court does not see why this would change whether he should be allowed a cause of action for money damages.  Indeed, the Sixth Circuit has recognized that *Carlson* provides a cause of action for a medical-indifference claim that did not result in death.  *See Koprowski v. Baker*, 822 F.3d 248, 252-58 (6th Cir. 2016) ("Although some of *Carlson's* analytical framework has been altered by later decisions, its core holding allowing just this sort of suit binds us.").

(ECF No. 38, PageID.442-443).

Arguing that the Sixth Circuit cases cited above are not "directly on-point," Hemingway urges the undersigned to reject its own prior conclusion and that of the district judge, as well as the reasoning of the Sixth Circuit, and to "apply the Supreme Court's precedents," despite being unable to point to Supreme Court authority that a deliberate indifference claim against the warden of a federal prison is not cognizable under *Bivens*.  The undersigned sees no basis to do so.

In sum, the undersigned will not consider arguments raised and rejected in the motion to dismiss.  However, as will be explained, Hemingway is entitled to summary judgment on the merits because he has convincingly shown that there is

no genuine issue of fact that he was at all involved in the decision to have Foreman

discharged from the hospital and returned to FCI Milan.

### 2.     Deliberate Indifference

Hemingway argues that, with the benefit of discovery, there is no evidence

of Foreman's remaining *Bivens* claim against him that would allow Foreman's case

to proceed.  He also argues that he is entitled to qualified immunity on Foreman's

claim, as he "did not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  (ECF No. 83, PageID.1742

(quoting *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (cleaned up))).

Qualified immunity was created to protect government officials from

interference with their official duties, and it "is an immunity from suit rather than a

mere defense to liability."  *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  It gives

officials "breathing room to make reasonable but mistaken judgments and protects

all but the plainly incompetent or those who knowingly violate the law."  *Stanton

v. Sims*, 571 U.S. 3, 6 (2013) (punctuation modified).  After a defending official

initially raises qualified immunity, the plaintiff bears the burden of showing that

the official is not entitled to qualified immunity.  *Burgess v. Fischer*, 735 F.3d 462,

472 (6th Cir. 2013).

The Sixth Circuit has "generally" used a two-step analysis in finding

qualified immunity: "(1) viewing the facts in the light most favorable to the

plaintiff, it determines whether the allegations give rise to a constitutional violation; and (2) it assesses whether the right was clearly established at the time of the incident." *Id.* (cleaned up). The steps may be considered in either order, so "[i]f the court concludes that no constitutional violation has occurred, there is no need to address whether the alleged right was clearly established." *Kinlin v. Kline*, 749 F.3d 573, 577 (6th Cir. 2014).

Considering the first step first, Foreman cannot show that Hemingway had any involvement in Foreman's medical care, including ordering him discharged from the hospital or specifically denying Foreman additional rehabilitative therapy. Even if the Court considers Foreman's claim that his doctor ordered an additional thirty days of care on May 1, 2020, which is not reflected in his medical records, all of the admissible evidence points to Hemingway having no role in cutting Foreman's care short. *See* ECF No. 81-5, PageID.1632 (Weaver's declaration); ECF No. 81-14, PageID.1709-1710 (Hemingway's interrogatory response). In rebuttal, Foreman says that an FCI Milan officer told him that Hemingway refused to pay anymore medical bills, which caused Foreman to be discharged back to FCI Milan early. (ECF No. 89, PageID.1849). As discussed above, this is hearsay evidence that would not be admissible in trial. Thus, a trier of fact would have no basis for believing that Hemingway had a role in Foreman's medical care. Without

this, Foreman cannot show that Hemingway was deliberately indifferent to his serious medical needs.

The result is that Foreman cannot prove a constitutional violation against Hemingway, and also that Hemingway is entitled to qualified immunity on Foreman's claim.  The Court need not reach whether the alleged constitutional violation was clearly established.  While Foreman's *allegations* satisfied the clearly established prong at the motion to dismiss stage, *see* ECF No. 29, PageID.334, the evidence has not borne those allegations out.  Therefore, Hemingway is entitled to summary judgment.

## VI.    Other Pending Motions

Aside from the two pending dispositive motions from defendants, three motions from Foreman remain pending: a motion for leave to file an amended declaration (ECF No. 95), a *third* motion to amend the complaint (ECF No. 101), and a motion to join two federal employees as defendants (ECF No. 105).  These will be addressed in turn below.

### A.    Amended Declaration (ECF No. 95)

Foreman has moved to amend his response to the Government's motion to change his declaration, marked "exhibit E," in order to address assertions made in Weaver's declaration.  In Foreman's proposed amended declaration, he states under penalty of perjury that Weaver did tell a guard to monitor him on the night

of April 8, 2020; that he was in distress when Weaver left that night; and that Weaver failed to do a physical exam to determine whether Foreman was suffering from mere dehydration, which would have confirmed that Foreman was actually suffering serious symptoms of COVID-19.  (ECF No. 95).

The undersigned has considered these facts above, but for the reasons stated, found them to be immaterial to the success of his claims.  Thus, Foreman's motion to have the amended declaration considered should be granted.  However, granting the motion does not change the recommendation that defendants are entitled to summary judgment as explained above.

B.     Motions for Leave to Amend and Add Defendants (ECF Nos. 101, 105)

The first of these motions is Foreman's *third* motion for leave to amend the complaint in an attempt to identify the officer he named as "Officer Patton" in the original complaint.  (ECF No. 101).  His first motion for leave to amend sought to change Patton to "Johnson" (ECF Nos. 84, 85).  He subsequently moved to voluntarily dismiss that motion, and moved for leave to amend the complaint a second time, substituting Patton (or Johnson) with "Harper."  (ECF Nos. 94, 96).  Foreman later moved to voluntarily dismiss that motion as well.  (ECF No. 100).

In his third motion, now before the Court, Foreman asserts that the identity of Patton is actually "Officer Patterson."  (ECF No. 101).  He also seeks to add other additional defendants, as well as additional claims against named defendants.

This motion should be denied as futile.  *See Haines v. Fed. Motor Carrier Safety Ass'n*, No. 14-CV-14438, 2015 WL 1912338, at *5 (E.D. Mich. Apr. 27, 2015), *aff'd on other grounds sub nom. Haines v. Fed. Motor Carrier Safety Admin.*, 814 F.3d 417 (6th Cir. 2016).  The statute of limitations for *Bivens* claims in Michigan is three years.  *Id.*  The set of facts Foreman bases his claims on occurred in April and May 2020.  This motion was filed on January 29, 2024.  As such, any claims against new defendants, including Patterson, would violate the statute of limitations.

As for his "additional" claims against named defendants, they are all substantially similar and occur in the same timeframe as the claims in his original complaint.  Similarly, they fail to state *Bivens* claims against the individual defendants, and fall under the FTCA's discretionary function exception as discussed above.  Therefore, Foreman's motion for leave to amend the complaint, (ECF No. 101), should be denied.

Finally, Foreman's motion to add federal defendants Hyder Syed Mohammed Fateh and Gregory A. Scherle,[4] (ECF No. 105), should be denied as well.  This motion was filed on March 5, 2024, and like the above motion, would violate the applicable statute of limitations.

---

[4] These are the same defendants Foreman sought to add, in addition to "Patterson," in his motion for leave to amend the complaint.

43

## VII.   Conclusion

For the reasons stated above, the undersigned RECOMMENDS that the Government's motion for summary judgment, (ECF No. 81), be GRANTED; Hemingway's motion for summary judgment, (ECF No. 83), be GRANTED; Foreman's motion for leave to file an amended declaration, (ECF No. 95), be GRANTED; and Foreman's motions to amend the complaint and add defendants to the complaint, (ECF Nos. 101, 105), be DENIED.  Further, the undersigned RECOMMENDS that Patton be dismissed *sua sponte* for Foreman's failure to serve him within the time limits set forth in Federal Rule of Civil Procedure 4(m). If these recommendations are adopted, the case will be dismissed in its entirety.

Dated: July 12, 2024                              s/Kimberly G. Altman
Detroit, Michigan                               KIMBERLY G. ALTMAN
                                                United States Magistrate Judge


## NOTICE TO PARTIES REGARDING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991).  Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a

44

party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the court determines that any objections are without merit, it may rule without awaiting the response.

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 12, 2024.

s/Carolyn M. Ciesla
CAROLYN M. CIESLA
Case Manager
